UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LINDA HARNESS, | ) |
| Plaintiff | ) ) ) |
| vs. | ) Cause No. 3:05-CV-648 RM ) |
| MICHAEL J. ASTRUE,[1] COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) ) |
| Defendant | ) |

OPINION AND ORDER

Linda Harness seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disabled widow's benefits under Titles II of the Social Security Act, 42 U.S.C. § 402(e). The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the court affirms the Commissioner's decision.

To be eligible for disabled widow's benefits,[2] Ms. Harness had to show that she was under a disability (as defined in 42 U.S.C. § 423(d)) which began before July 31, 2008, 7 years after the death of her husband (the "fully insured individual"). 42 U.S.C. §§ 402(e)(1)(B)(ii) and (e)(4). Ms. Harness contends that she has been disabled since May 18, 2001, due to degenerative disc disease,

---

[1] Michael J. Astrue, the current Commissioner of Social Security, has been automatically substituted as the named defendant, pursuant to Fed. R Civ. P. 25(d)(1).

[2] Ms. Harness alleged an onset date of November 4, 1999 in her application for benefits, but later amended the date to May 18, 2001, making her ineligible for disability insurance benefits based upon her own earnings record.

congestive heart failure, fibormyalgia, depression, and chronic fatigue. Her application for benefits was denied initially, on reconsideration, and following an administrative hearing on April 27, 2004, at which she was represented by counsel. At that hearing, the administrative law judge (ALJ) heard testimony from Ms. Harness, her friend Veitia Cobb, and vocational expert Dr. Leonard Fisher. The ALJ concluded that Ms. Harness was not disabled within the meaning of the Social Security Act and was not entitled to benefits. When the Appeals Council denied Ms. Harness's request for review, the ALJ's decision became the final decision of the Commissioner of Social Security. Fast v. Barnhart, 397 F.468, 470 (7th Cir. 2005). This suit followed.

Judicial review of the Commissioner's final decision is limited. 42 U.S.C. § 405(g); Jones v. Shalala, 10 F.3d 522, 523 (7th Cir. 1993). The court must sustain the ALJ's findings as long as they are supported by substantial evidence. 42 U.S.C. 405(g); Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004); Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." Young v. Barnhart, 362 F.3d at 1001. The court cannot substitute its judgment for that of the ALJ by reweighing the evidence, resolving factual conflicts in the record, or reconsidering credibility determinations that are not patently wrong. Young v. Barnhart, 362 F.3d at 1001; Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

2

Applying Social Security's 5-step sequential evaluation for determining disability, *see* 20 C.F.R. § 404.1520, the ALJ found that: (1) Ms. Harness had not engaged in substantial gainful activity since the alleged onset of disability; (2) her degenerative disease of the spine and heart disease were severe, but her other impairments (depression and diabetes) were either not severe, or were not medically determinable impairments (fibromyalgia and chronic fatigue syndrome); and (3) none of her impairments met or equaled, either singly or in combination, the severity requirements of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1.

At step 4 of the evaluation, the ALJ found that Ms. Harness's testimony about the severity of her impairments and related symptoms and limitations was unreliable and so not credible, and did not accord it favorable weight in evaluating her residual functional capacity. Based on the medical findings of heart disease and spinal subluxation, the ALJ found that Ms. Harness was unable to perform her past relevant work as a restaurant manager, kitchen manager, and truck driver, but retained the residual functional capacity to perform a significant, though not full, range of light work as defined in 20 C.F.R. § 404.1567.[3] The ALJ

---

[3] 20 C.F.R. 404.1567(b) defines light work as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

3

found that Ms. Harness could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could not perform prolonged carrying or sustained lifting and holding, and could reach extreme postures (stooping, bending, climbing, kneeling, squatting) only occasionally.

Relying on the vocational expert's testimony, and using the Medical Vocational Guidelines as a framework, the ALJ concluded at the fifth and final step of his evaluation that there were a significant number of jobs in the national economy that Ms. Harness could still perform, including work as a receptionist, information clerk, and order clerk, and that she was not under a disability as defined in the Act at any time though the date of the decision (November 8, 2004).

Ms. Harness challenges the ALJ's findings with respect to the severity of her impairments, her credibility, and her residual functional capacity. She contends that the ALJ disregarded medical evidence that showed that she suffered from severe fibromyalgia, chronic fatigue syndrome, and diminished mental capacity, and substantiated her testimony regarding those impairments. Ms. Harness contends that the ALJ also misstated the record with respect to Ms. Cobb's testimony, and did not give any weight to the vocational expert's testimony regarding the vocational limits to which she testified (the need to elevate her feet every 20-30 minutes, an inability to focus for two hours at a time, and numbness in her hands), or state his reasons for rejecting that evidence. Ms. Harness asks that the ALJ's decision be reversed and the case remanded.

The Commissioner maintains that the ALJ properly applied the legal standards that govern disability determinations, that substantial evidence supports the ALJ's residual functional capacity, credibility, and vocational findings, and that the ALJ's decision should be affirmed. The court agrees.

Ms. Harness contends that the ALJ "seems to handpick" only the medical evidence that supports his conclusions, "while disregarding some of the vital evidence that points directly to Ms. Harness's limitations." She says the ALJ failed to consider all of the medical evidence when he determined that her heart and back impairments were not "severe." The ALJ, however, stated in his decision that those impairments were severe, but didn't meet the listing requirements for musculoskeletal and cardiovascular impairments. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Secs. 1.00 and 4.00. Ms. Harness hasn't presented any evidence to the contrary, and the burden of proof at steps one through four of the disability evaluation was hers. *See* 20 C.F.R. 404.1520; Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Harness also contends that the ALJ disregarded records of her treating physician, Dr. Byron Holm, dated after June 2000, that showed that she suffered from fatigue, elevated cholesterol, elevated triglyceride and chest pains, and substantiated her testimony that she had fibromyalgia and chronic fatigue syndrome. She contends that:

5

> [T]he ALJ refers to an examination by Byron Holm, M.D. (Ex. 1F, pages 16 and 17), in concluding that the claimant has no chest pain, secondary fatigue, and exercise tolerance. However, upon a complete review of the entire compilation of medical records from Dr. Holm (Ex. 1F, pgs. 1-38), it is clear that Ms. Harness met with Dr. Holm at least six times after that date [June 20, 2000]. These latter medical records reveal that Ms. Harness was having problems with fatigue, elevated cholesterol, elevated triglyceride, and chest pains. The record also indicates that Ms. Harness has difficulty even completing a treadmill stress test (Ex. 8F 32-44).

Ms. Harness contends that the ALJ didn't give any weight to the subsequent medical records or "even the medical records as a whole."

The exhibit to which Ms. Harness refers (Exhibit 1F, pages 16-17) was not an examination by Dr. Holm. It was a diagnostic interpretation of a stress test Dr. Timothy Aldridge performed on June 20, 2000, at Dr. Holm's request. The findings reported were Dr. Aldridge's.

Before the test, Ms. Harness was on low dose beta-blocker, diuretic therapy (i.e., Ziac, Zyrtec, Ativan, and Prilosec). Dr. Aldridge indicated in his report that she exercised for a total of three minutes, but the treadmill was stopped secondary to fatigue, leg pain, and the patient's request. At peak exertion, the heart rate response was only 69% of predicted maximal heart rate, and Dr. Aldridge surmised that the probable etiology was the beta-blockade, although he couldn't exclude chronotropic incompetence and limited exercise tolerance. Dr. Aldridge reported non-diagnostic pseudonormalization of the ST-T wave changes in the inferolateral leads, and indicated that Ms. Harness' blood pressure response was adequate, her exercise tolerance limited, and her recovery period unremarkable.

Test results indicated: (1) a small fixed area of patchy perfusion involving the anterolateral wall of the left ventricle–negative for exercise induced ischemia; (2) no focal wall motion abnormality; (3) 46% left ventricular ejection fraction and (4) submaximal treadmill exercise exam–failure to reach the 85% predicted maximum heart rate for age. Dr. Aldridge's only recommendation was aggressive risk factor modification, i.e., exercise program, weight reduction, low sodium/low cholesterol diet. Dr. Holm related these findings to Ms. Harness at an appointment on August 15, 2000. He concluded that the test indicated that "there appeared to be no profusion defects from the standpoint of ischemia and the heart wall motion appeared to look normal."

The ALJ accurately reported these findings in his decision, noted that a subsequent echocardiogram in February 2002 revealed normal left ventricular function and an ejection fraction of 55 percent, and found that Ms. Harness's heart impairment, while severe, did not meet the requirements of any of the cardiovascular listings. As already noted, Ms. Harness does not contend that her heart impairment met the requirements of a listed impairment, nor would the evidence, including Dr. Holm's record of examinations after June 2000, support such a claim.

Ms. Harness contends that Dr. Holm's post-June 2000 records also prove that she had fibromyalgia and chronic fatigue syndrome, and substantiate her testimony about the severity of those conditions. She says the ALJ's failure to

7

address that evidence and credit her testimony constitutes reversible error. The court cannot agree.

Ms. Harness had 7 appointments with Dr. Holm between June 21, 2000 and August 16, 2001. All but one were listed simply as a "recheck".[4] Dr. Holm's records note that Ms. Harness complained of some level of fatigue at four of those visits, but reported no fatigue, chest pain, chest tightness, or palpitations on August 15, 2000, April 30, 2001, or August 16, 2001. His diagnoses included benign hypertension, reflux esophagitis, mixed hyperlipidemia, and "other malaise & fatigue," but not fibromyalgia or chronic fatigue syndrome. The ALJ found that:

> Treating medical sources Byron Holm, M.D. (Exhibit 1F), Timothy Aldridge, M.D., and Toni Baldwin, R.N., F.N.P. (Exhibit 8F) have not observed [the alleged symptoms of chronic fatigue or fibromyalgia]; there are no mentions of tender trigger points in their treatment records and only occasional reports of fatigue since the amended onset date [May 18, 2001].

The medical evidence in general, and Dr. Holm's records in particular, support those findings.

Ms. Harness assertion that "[t]he fibromyalgia and pain associated with it was recognized and treated by Dr. Thomas Barbour," and that the ALJ disregarded that evidence in determining disability, is similarly unpersuasive. Dr. Barbour was a consulting physician. He didn't treat Ms. Harness for fibromyalgia or pain associated with that condition. Dr. Barbour examined Ms. Harness on November 26, 2001, and issued a disability determination based on his review of

---

[4] The October 27, 2000 office visit was for treatment of abdominal pain, nausea, vomiting and diarrhea.

the records, Ms. Harness's stated medical history, and his examination. He concluded that Ms. Harness "had a history consistent with fibromyalgia, chronic neck and low back pain and congestive heart failure," and that those conditions "continue to interfere with daily activities." Dr. Barbour indicated that the prognosis for further improvement ranged from "guarded" to "poor," and he "highly recommended" followup.

> The ALJ found that:
>
> Thomas Barbour, M.D., a consultative physical examiner, observed that fibromyalgia was consistent with the claimant's complaints and history, but his clinical findings did not support that diagnosis because the claimant's gait and posture were normal, and there were no tender trigger points. Fibromyalgia is a diagnosis of exclusion, and other causes for fatigue and muscle aches have not been ruled out in light of her heart disease and degenerative spinal disease. Thus, the diagnoses of fibromyalgia and chronic fatigue syndrome are not supported as medically determinable impairments in this claim.

Having "a history consistent with fibromyalgia" is not the equivalent of a diagnosis of fibromyalgia. The history on which Dr. Barbour relied was based on Ms. Harness's subjective complaints and statements about her symptoms and limitations, and a review of old medical records that contained no diagnosis or findings of fibromyalgia. Dr. Barbour's opinion is consistent with Ms. Harness's testimony, but the ALJ found her testimony to be unreliable, inconsistent, and unsupported by the objective medical evidence provided by her treating medical sources, Dr. Holm, Dr. Aldridge, and Nurse Practioner Toni Baldwin. Given those inconsistencies and the absence of any clinical findings supporting a diagnosis of fibromyalgia, the ALJ concluded that Dr. Barbour's report did not establish the

9

existence of a medically determinable impairment. That conclusion is both reasonable and substantially supported by the evidence.

To succeed on her challenge to the ALJ's credibility determination, Ms. Harness must show that his decision was patently wrong. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). She has not done so.

In evaluating the credibility of the testimony, the ALJ must first determine whether the objective medical evidence supports the claimant's subjective complaints or pain and other symptoms. Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004); Zurawski v. Halter, 245 F.3d at 887. He found that it did not, and as the previous discussion demonstrates, that finding is reasonable.

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects on the claimant. [H]e must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); *see also* Scheck v. Barnhart, 357 F.3d at 703; Zurawski v. Halter, 245 F.3d at 887.

The ALJ, accordingly, expanded his inquiry into other relevant factors. He found that "[t]he claimant's testimony and that of her friend [Ms. Cobb] show that

she is actually quite active despite what appears to be attention seeking complaining."[5] The ALJ noted that Ms. Harness received only conservative chiropractic treatment for pain and was not taking strong narcotic pain medications, that there were no x-rays or other imaging studies evidencing significant bony problems or disc disease in the claimant's spine, and that physical examinations consistently showed normal posture, gait, grip, fine manipulation, reflexes, and sensation in the extremities. He also noted that Ms. Harness made materially inconsistent and factually unsupported representations to medical examiners on more than one occasion exaggerating the severity of her impairments, and gave specific examples of the inconsistent statements. He concluded on basis of this evidence and the medical evidence before him, that Ms. Harness was not a reliable and credible witness. His analysis is thorough, well-supported, and well-reasoned, and is entitled to deference. Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006).

The final error ascribed to the ALJ is an alleged failure to articulate his reasons for rejecting the vocational expert's testimony that there were no jobs available for an individual who had to elevate her feet every 20 minutes, couldn't focus or concentrate for an extended period of time (2 hours in a work day), and

---

[5] Ms. Harness contends that the ALJ misstated the evidence when he said that Ms. Cobb "told of shopping with the claimant as a routine activity," and that the record actually indicates that it was common for Ms. Harness to "do things" with Ms. Cobb. The "things" to which Ms. Cobb referred, however, were shopping and attending a festival, and the distinction between "routine" and "common" is a matter of semantics. Ms. Cobb's testimony was disjointed and difficult to follow. Had the ALJ based his credibility and residual functional capacity determinations solely on that testimony, as Ms. Harness suggests, reversal would have been warranted. He did not do so.

didn't have dexterity of their hands. Had the evidence showed that Ms. Harness's ability to function was so limited, the ALJ would have been remiss in not stating his reasons for rejecting the vocational expert's testimony. The evidence did not so show. Ms. Harness's testimony provided the only evidence of such extreme limitations, and the ALJ found that her testimony was not credible. The ALJ sufficiently articulated his reasons and supported them with substantial evidence. The law requires nothing more.

## CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the Commissioner of Social Security.

SO ORDERED.

ENTERED:   March 26, 2007

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court